# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Gleamin Inc.<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 22-_____ (__) |

## DECLARATION OF JORDAN SMYTH IN SUPPORT OF FIRST DAY RELIEF

I, Jordan Smyth, hereby declare as follows:

1. I am the founder and chief executive officer of Gleamin Inc., the debtor and debtor in possession in this chapter 11 case ("Gleamin" or the "Debtor").

2. As the Debtor's founder and CEO, I am familiar with the Debtor's business, day-to-day operations, financial affairs, and books and records. Except as otherwise indicated, the statements set forth in this First Day Declaration are based upon my personal knowledge of the Debtor's operations, information learned from my review of relevant documents, information supplied to me from the Debtor's advisors, or my own opinion based on my knowledge, experience and information concerning the Debtor's operations and financial condition. I am authorized to submit this declaration on behalf of the Debtor. If called to testify, I could and would testify competently to the matters set forth in this declaration.

3. On August 17, 2022 (the "Petition Date"), the Debtor filed a voluntary petition commencing this chapter 11 case (the "Chapter 11 Case"). The Debtor is eligible, and has

---

[1] The last four digits of the Debtor's federal tax identification number are 9044. The Debtor's corporate headquarters and mailing address is 750 N. San Vicente Blvd., Suite 800, West Los Angeles, CA 90069.

elected, to proceed under Subchapter V of title 11 of the United States Code (the "Bankruptcy Code").

4. The Debtor continues to operate its business and manage its affairs in the ordinary course of business as debtor in possession. The Debtor has filed various motions identified herein requesting "first day" relief. I submit this declaration in support of such first day relief, as well as to provide support for, and background concerning, the Chapter 11 Case and other pleadings filed or expected to be filed in this case.

## I. OVERVIEW OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS

### A. The Debtor's Business

5. Gleamin is a direct-to-consumer ("DTC") owner and wholesaler of skincare products, including face masks, serums, and moisturizers. Its products are built with sustainable, ethically sourced superfoods that are safe for all skin types. For example, Gleamin's most popular product, the Vitamin C Clay Mask, is a 100% natural Australian clay mask infused with a super-dose of vitamin C, turmeric, aloe vera, desert and caviar limes, kakadu plum, castor oil, and almond oil. A snapshot of some of Gleamin's most popular products (including the Vitamin C Clay Mask) is below:



6.      Since I founded the company in March 2019, Gleamin has averaged $6,300,00 in gross sales annually.  Gross sales as of July 31, 2022 for calendar year 2022 remain strong at $3,100,000.

**B.    The Debtor's Capital Structure**

7.      As of the Petition Date, the Debtor has secured debt totaling approximately $475,000, consisting mostly of private loans.  The Debtor also has unsecured trade debt totaling approximately $1.7M.

8.      The Debtor subleases an office in Los Angeles, but is current on rent.  All of the Debtor's product is stored and shipped by two third-party logistics companies ("3PL"), one in Ohio and the other in the United Kingdom.  The Debtor is current with respect to both of its 3PLs.

9. There are currently 10 million shares outstanding of the Debtor's common stock, five million of which are held by the Debtor's direct parent, Broadthoughts Holdings PTY Ltd. No other entity currently holds equity interests in the Debtor.

## II.    EVENTS LEADING TO FILING THE CHAPTER 11 CASE

10. The Debtor experienced incredible success early in its existence, including selling over 500,000 units of the Vitamin C Clay Mask and achieving top-seller product status on Amazon.com. This success led to rapid growth in 2019 and 2020, leading to an eight-figure run rate for the company.

11. Because the Debtor previously manufactured all of its product in Australia, the Debtor's normal supply chain can take around 14 more weeks per product than a product made in the United States. Therefore, it is imperative that the Debtor hold sufficient inventory to meet demand.

12. Of course, like countless other DTC companies in the retail industry, the Debtor did not anticipate the unprecedented supply chain disruption caused by the spread of the novel coronavirus disease 2019 ("COVID-19"). Once COVID-19 hit, the timeline for product increased dramatically and crippled sales.

13. In addition, the Debtor also experienced market efficiency drop-off due to the iOS 14 release. This change limited ad functions on popular social media sites like Facebook.com and its tracking for application and web conversion events. As a result, personalizations and performance reporting was hindered with respect to customers on those platforms leading to an unanticipated material loss of marketing efficiency and a decrease in margins. Such inefficiency got increasingly worse throughout calendar year 2021.

14. The combination of the pandemic and the marketing efficiency drop-off created a perfect storm for the Debtor which required an increase in working capital to fund inventory and marketing for the holiday season. Larger purchase orders had to be placed to make up for the lost time gap in the supply chain. With large gaps in the supply chain, the Debtor was consistently unable to fulfill demand, leading to lost momentum with its customer base. Once inventory was restored, however, the Debtor needed to spend more (at a decreased efficiency due to the tracking drop-off) to acquire customers and build back demand.

15. The Debtor also made numerous mis-hires which led to failures in its marketing campaign and team efficiency.

16. Considering the financial troubles of calendar year 2021, the Debtor was relying on a strong holiday season in December 2021 to right the ship. However, holiday 2021 sales failed to hit the mark, falling 35% year-over-year.

17. Accordingly, in Q1 2022, the Debtor began phase 1 of its restructuring efforts which included:

- Implementing payroll reductions and layoffs which resulted in total savings of approximately $720,000;
- Reducing management salaries (including my own);
- Ending relationships with non-critical agencies, external vendors and contractors, which provided savings of approximately $340,000;
- Reactivating spending on digital channels;
- Renegotiating terms with certain key vendors of the Debtor; and
- Moving manufacturing to the United States, resulting in anticipated savings of approximately $630,000.

18. In connection with the above initiatives, as of June 2022, I remained the only employee of the Debtor.

19. Notwithstanding the above actions, the Debtor remained unable to pay its secured and unsecured vendors in full in accordance with the terms of their respective agreements. Accordingly, in June 2022, the Debtor started exploring restructuring alternatives to right-size its balance sheet. In connection therewith, in or around July 2022, the Debtor retained Pashman Stein Walder Hayden, P.C. to serve as its counsel.

20. When negotiations with its largest secured creditor failed to produce a reasonable payment plan, the Debtor chose to file a voluntary petition under Subchapter V to implement the automatic stay and provide the Debtor with the necessary breathing room to successfully complete its restructuring. The Debtor files this case with the goal of right-sizing its balance sheet and confirming a plan of reorganization that will pay their secured creditors in full over time and provide value to its unsecured creditors. The Debtor is in a strong position upon entering chapter 11, and it looks forward to working with its creditors, vendors and other parties in interest as it charts the path to continue providing its customers with healthy, vibrant and glowing skin for many years to come.

### III. FIRST DAY MOTIONS

21. Concurrently with the filing of its chapter 11 petition, the Debtor has filed a number of motions identified herein requesting "first day" relief (the "First Day Motions") that the Debtor believes is necessary to enable them to maximize the value of its estate while the Chapter 11 Case is pending.

22. The facts set forth in the First Day Motions are incorporated herein in their entirety. The Debtor requests that the Court grant the First Day Motions as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtor's operations during the pendency of, this Chapter 11 Case.

23. I have reviewed each of the First Day Motions, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on the Debtor's personnel and advisors. To this end, the Debtor has filed the following First Day Motions:

   i. *Debtor's Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtor to Pay Certain Taxes*

   ii. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Honor and Continue Certain Customer Programs, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfers Requests Related Thereto, and (III) Granting Related Relief*

   iii. *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System, (II) Authorizing Use of Prepetition Bank Accounts and Payment Methods, (III) Authorizing Use of Existing Business Forms, (IV) Authorizing Continuation of Ordinary Course Intercompany Transactions, (V) Granting Administrative Priority to Post-Petition Intercompany Claims, (VI) Extending Time to Comply with the Requirements of 11 U.S.C. § 345(b), (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief*

24. It is my belief that the relief sought in each of the First Day Motions is necessary for a successful reorganization and to maximize creditor recoveries. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.* the First Day Motions seeking relief related to the Debtor's obligations to its taxing authorities, customers, and bank, the relief requested is essential to avoid immediate and irreparable harm to the Debtor's estate. The success of this Chapter 11 Case depends upon the Debtor's ability to maintain its operations and maximize estate value. The relief requested in the First Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

## **CONCLUSION**

25. I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully requests that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: August 17, 2022
       Melbourne, Australia

*/s/ Jordan Smyth*
Jordan Smyth